IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOHN W. OXENDINE | Criminal Action No.<br><br>1:22-CR-00183-SCJ-RDC |

**Government's Sentencing Memorandum**

The United States of America, by Ryan K. Buchanan, United States Attorney, and Christopher J. Huber and David A. O'Neal , Assistant United States Attorneys for the Northern District of Georgia, files this Sentencing Memorandum for defendant John Oxendine to assist the Court in imposing a just sentence.

**Introduction**

At sentencing, the government will recommend that Oxendine be sentenced to 44 months' imprisonment. As discussed below, this is in the upper half of Oxendine's Guidelines and is reasonable, meeting the goals of 18 U.S.C. § 3553(a). As an initial matter, this memorandum addresses two PSR objections – loss and the two level enhancement for use of a special skill. The government and Oxendine agree that this Court should apply an 14-level enhancement for loss. Oxendine objects to the enhancement for role in the offense under § 3B1.3; the government argues for application of this enhancement below. Given these arguments, the government believes Oxendine's Guidelines range should be 37-

46 months. Applying the 3553(a) factors results in a government recommendation of a sentence of 44 months' imprisonment and a $700,000 fine.

## Procedural Background

Oxendine was charged by Indictment with one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) on May 17, 2022. Doc. 1, PSR ¶¶ 1-16 (the Indictment was superseded on May 2, 2023). Oxendine entered a negotiated plea of guilty to Count One of the Superseding Indictment on March 22, 2024. PSR ¶ 17. The U.S. Probation Office calculated Oxendine's total offense level as a 23, and his Criminal History Category as I. PSR ¶¶ 85, 97. Both the government and Oxendine have filed objections to the PSR; the government argues that his total offense level after the objections are resolved is 21. Oxendine's sentencing is scheduled for July 12 at 10:00 am.

## Relevant Facts

Defendant John Oxendine is the former Georgia State Insurance Commissioner. PSR ¶ 31. He had a multi-year relationship with Dr. Jeffrey Gallups, who was the owner, CEO, and Medical Director of the ENT Institute, a medical practice with multiple locations in the Northern District of Georgia. PSR ¶¶ 20, 21, 31.

In 2015, Dr. Gallups began discussion with NextHealth, a laboratory in Texas, to begin toxicology and genetics testing on ENTI patients. But NextHealth

initially did not agree to the arrangement and Dr. Gallups turned to Oxendine. PSR ¶ 57. Oxendine then led the discussions with NextHealth. After Oxendine took over the discussions, NextHealth agreed to work with ENTI and Dr. Gallups. PSR ¶ 23. It agreed to pay kickbacks to Dr. Gallups that amounted to 50% of the net profits from toxicology and genetics testing for ENTI patients. *Id.*

Before any payments were made, however, both Next Health and Dr. Gallups had concerns. Next Health did not want to pay the kickbacks to Dr. Gallups directly for the referrals. And Dr. Gallups did not want the physicians at ENTI to know that he was being paid for the referrals. Oxendine provided a solution; NextHealth would pay Oxendine for the referrals and then Oxendine could pay Dr. Gallups. NextHealth agreed and the kickbacks were paid to Oxendine's insurance business, Oxendine Insurance Services. *See* PSR ¶ 50.

In connection with these agreements, ENTI instituted protocols that required toxicology and genetics testing for all new patients and all patients with a scheduled procedure. ENTI physicians objected to these tests and there was considerable resistance to ordering the tests. *See* PSR ¶¶ 23, 25-30.

This led to a retreat at the Ritz Carlton in Buckhead. Oxendine spoke at the retreat and Dr. Gallups introduced him as the former Georgia state insurance commissioner. PSR ¶¶ 6, 32, 57. Notes taken at the meeting reflect that Oxendine told the physicians that failing to order the tests was "textbook liability." *See* Ritz Carlton Agenda with notes, Ex. 1 at 1.

On or about June 17, 2016, NextHealth sent the first kickback check to Oxendine Insurance Services in the amount of $227,066.56. *See* Email to Oxendine

attaching breakdown of kickbacks (June 17, 2016), Ex. 2 at 1. That reflected 50% of the net profits for testing referrals from October 2015 through May 2016.

Along with the payment, NextHealth sent Oxendine commission statements which showed each test, the date of service, the doctor at ENTI associated with the test, the amount billed to the insurance company, and the insurance company billed. They showed that the insurance companies were billed as much at $10,125.99 for the genetics tests and $12,913.80 for the toxicology tests. Ex. 2 at 4, 19. And insurance companies paid up to $10,125.99 for the genetics tests and $7,352.82 for the toxicology tests. Ex. 2 at 4, 31. In addition, some patients received bills for the testing for as much as $18,000. PSR ¶¶ 26, 65.

To pay Dr. Gallups his portion of these kickbacks, Oxendine paid various expenses for Dr. Gallups, including $70,759.54 in attorney fees and a charitable donation of $150,000 on behalf of Dr. Gallups. PSR ¶ 31.

## Argument

**1. To ensure consistency with Dr. Gallups's sentencing, Oxendine should be held responsible for the amount paid by insurers, rather than the amount billed.**

With respect to loss, PSR correctly sets forth the billed amounts for the various insurance carriers as a result of the fraudulent scheme, which was $3,015,661.62. PSR ¶ 67. In order to be consistent with the loss position taken in Dr. Jeffrey Gallups's sentencing and consistent with the plea agreement in this case, the government objects to the loss amount in the PSR. The government believes the Court should find that loss is the amount paid, which is $760,454.78.

PSR ¶ 67. This would result in a 14-level enhancement, rather than the 16-level enhancement recommended by the PSR.

## 2. Defendant Oxendine should receive a 2-level enhancement pursuant to U.S.S.G § 3B1.3 for his use of a special skill.

Guidelines Section 3B1.3 provides a 2-level enhancement "[i]f the defendant . . . used a special skill[] in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. The commentary defines a "special skill" as one "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing." *Id.* cmt 4. Examples include pilots, lawyers, doctors, accountants, chemists, and demolition experts." *Id*. cmt. 4. Although individuals with professional licensure or training are the listed examples provided by the Sentencing Commission, "[i]f an 'average person off the street' does not possess the skill, then the skill is considered 'special' for the purposes of applying the enhancement." *United States v. De La Cruz Suarez*, 601 F.3d 1202 at 1219 (11th Cir. 2010) (quoting *United States v. Calderon*, 127 F.3d 1314, 1339 (11th Cir. 1997)).

### A. Oxendine used his special skill as an attorney to facilitate and conceal the offense.

It is well-established that a defendant's use of his skills at an attorney to further or conceal the offense is sufficient to trigger application of the two-level enhancement in Section 3B1.3, which specifically lists lawyers. U.S.S.G. § 3B1.3, cmt. 4. This is especially true where, as here, the defendant used his skills and experience as an attorney to "lull victims into believing that nothing was amiss,

5

which helped conceal the fraud as long as possible." *United States v. Ellis*, 817 F. App'x 780, 791 (11th Cir. 2020); *see also United States v. Shenberg*, 89 F.3d 1461, 1478 (11th Cir. 1996) (holding that special skill enhancement was proper where attorney's knowledge helped "avoid raising 'red flags'"); *United Stats v. Nawaz*, 555 F. App'x 19 (2d Cir. 2014) (applying special skill enhancement where disbarred attorney used his legal skills to advise their mortgage fraud coconspirators as to how to handle inquiries that could disrupt the scheme).

Here, Oxendine used his experience and skills as an attorney to broker the illegal kickback agreement between NextHealth and Dr. Gallups. Indeed, after Dr. Gallups tried and failed to negotiate a deal with NextHealth on his own, he reached out to Oxendine about his troubles. PSR ¶ 57. Oxendine had several clients that did business with NextHealth and stated: "I am an attorney. I do health care law. We can do this." *Id.* Oxendine then traveled with Dr. Gallups to Dallas, Texas where he met with NextHealth executives to broker the illegal testing deal. *Id.*

Oxendine's skills and experience as an attorney were also vital to the scheme in another way. Specifically, Dr. Gallups advised Oxendine that the illegal scheme would be difficult to pull off because his physicians were not on board with ordering these tests, which had no place in an ENT practice. *Id.* Oxendine then proposed to Dr. Gallups that he could use his legal skills to scare the doctors into performing the tests by threatening bogus "legal risk of not performing the tests." *Id.* Dr. Gallups then scheduled a meeting at the Ritz Carlton in Atlanta.

At the Ritz Carlton meeting, Oxendine "told physicians that by not conducting the tests it could be considered malpractice." PSR ¶ 58. Dr. Gallups admitted that the Ritz Carlton meeting was phony and that its only purpose was to get the physicians to perform the tests. *Id.* Dr. Matthew Gill, one of the physicians present at the Ritz Carlton meeting, stated that Oxendine "pushed the physicians to order the drug screening and DNA tests, and referred to some State legislation that would make the physicians liable if a patient had a bad reaction to a drug that could have been avoided if the tests had been run." Report of Interview of Dr. Matthew Gill (Mar. 27, 2018), Ex. 3, at 3. Moreover, according to contemporaneous notes taken by Dr. Gill at the Ritz Carlton meeting, Defendant Oxendine told the ENT Institution physicians that not ordering the genetic and toxicology tests was "textbook liability" and that the doctors "need to practice def[ensive] medicine → using all available info/tech." Ex. 1 at 1.

Oxendine's skills as an attorney, therefore, were vital to the success of the fraud scheme in that they were used both to facilitate the illegal agreement and to convince reluctant doctors to order medically unnecessary tests.[1]

---

[1] His position as an attorney also made investigation more difficult. Dr. Gallups recorded multiple conversations with Oxendine. Because of potential privilege issues, these recordings had to be reviewed by a filter team before the prosecution team could access them, causing significant delay. In addition, a filter team had to review the search warrant returns from Oxendine's email account to protect against inadvertent review of privileged information.

### B. Oxendine used his special skill as the former Georgia Insurance Commissioner to facilitate and conceal the offense.

In addition to his skills as an attorney, Oxendine also used his experience and skills as the former insurance commissioner to both facilitate the fraud on insurance programs as well as the gravitas of his former position to sell the scheme to reluctant ENT doctors. Andrew Hillman, who was the owner of NextHealth during the fraud scheme, was initially reluctant to enter into a deal with Dr. Gallups's practice because it would look strange for ENT doctors to order genetic tests. *See* Report of Interview of Andrew Hillman (Jan. 31, 2022), Ex. 4, at 2. Oxendine pushed back, telling Hillman that ENT Institute physicians were medical doctors and could order any type of test they wanted. *Id*. Moreover, Hillman stated that "Oxendine referenced his former position as the Insurance Commissioner of Georgia during the deals. Oxendine knew the system, rules, and the state of Georgia. Oxendine boasted he could get any insurance company on the phone and get any claim paid." PSR ¶ 50. He was also introduced as the former "GA ins commish for 16 yrs" at the Ritz Carlton meeting. Ex. 1 at 1.

Oxendine, therefore, used the connections, knowledge, and skills he gained as the Insurance Commissioner for the State of Georgia to both sell Hillman on the fraud scheme and to assure his co-conspirators that they would avoid detection. As these skills are not possessed by an average person off the street – indeed, as a state-wide elected position, individuals with the special skills of an Insurance Commissioner are extremely limited – the "special skill" enhancement pursuant to Section 3B1.3 applies.

3. **The sentencing factors set forth in 18 U.S.C. § 3553(a) support a sentence of 44 months.**

Section 3553(a) requires the Court to "impose a sentence sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in § 3553(a)(2). Those purposes are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2)(A)-(D). The Court is also instructed to take into account "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). And finally, the sentence imposed should reflect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

In fashioning a sentence that complies with the "overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing," *Kimbrough v. United States*, 552 U.S. 85, 101 (2007), the Court must consider the broad range of factors set forth in § 3553(a). *See Pepper v. United States*, 562 U.S. 476, 491 (2011) (sentencing in accordance with "sufficient, but not greater than necessary" mandate is the district court's "overarching duty"). In doing so, the Court must "make an individualized assessment based on the facts presented" and determine their

9

appropriate weight in light of the purposes of sentencing. *Gall v. United States*, 552 U.S. 38, 50-52 (2007).

And while no longer bound by the Guidelines, both the Supreme Court and Eleventh Circuit have explained that if the district court is to impose a sentence outside of the advisory range, "it must explain why that variance is 'appropriate in a particular case with sufficient justifications' [and] [t]he justifications should be 'sufficiently compelling to support the degree of the variance.'" *United States v. Pedraza-Mendoza*, 578 F. App'x 851, 853 (11th Cir. 2014) (quoting *Gall*, 552 U.S. at 46).

A careful consideration and application of the § 3553(a) factors to Oxendine establishes that a sentence of 44 months, is sufficient but not greater than necessary to achieve the goals of sentencing.

As an initial matter, this is an egregious case. The former elected Georgia Insurance Commissioner conspired to commit health care fraud. He made the fraud a reality. *See* PSR ¶ 57 (Dr. Gallups had difficulty getting started with NextHealth until Oxendine stepped in). He negotiated for NextHealth to pay kickbacks in exchange for unnecessary lab tests – genetics tests and toxicology (drug) tests. PSR ¶¶ 49, 50, 57. NextHealth then billed private insurance companies as much as $10,125.99 for the genetics tests and was reimbursed up to that amount – for each test. Email to Oxendine attaching breakdown of kickbacks (June 17, 2016), Ex. 2 at 4. It billed as much as $12,913.80 for the toxicology testing and was reimbursed as much as $7,352.82. *Id.* at 19, 31. These were not cheap tests. And they were mandated for all new patients and all patients undergoing a

procedure at Dr. Gallups's practice. PSR ¶¶ 23, 25-30. On top of billing insurance companies thousands of dollars for these tests, if the insurance company denied the claims, NextHealth billed the patients for these tests. Because Dr. Gallups's practice ordered both genetics tests and toxicology tests, patients received bills of up to $18,000. PSR ¶¶ 26, 65.

And Oxendine worked to conceal the kickbacks. When NextHealth expressed concern about paying Dr. Gallups directly, Oxendine entered into a contract with NextHealth so the payments went to his insurance consulting company, Oxendine Insurance Services. PSR ¶¶ 50, 51, 69. Oxendine then paid expenses for Dr. Gallups, rather than paying Dr. Gallups directly. PSR ¶ 61. Oxendine knew NextHealth was "doing shady stuff," but instead of "walk[ing] away from these guys," Oxendine signed up. *See Oxendine caught up in lab testing dispute*, Atlanta Journal-Constitution (Aug. 11, 2018), Ex. 5 at 3.

Oxendine's history and characteristics underscore the need for a serious sentence. He held state-wide, elected office. He was a viable candidate for governor. He was an attorney with an established insurance consulting business. He had the world at his fingertips. And instead of using these advantages to advance legally and legitimately, he used them to concoct and conduct health care fraud. To defraud the very companies he licensed and regulated as Insurance Commissioner. *See* https://georgia.gov/organization/office-insurance-and-safety-fire-commissioner (visited on July 4, 2024). To defraud the very companies he was empowered to investigate for fraud as Insurance Commissioner. *Id.*

As the former Insurance Commissioner and a lawyer, Oxendine should have stopped the scheme instead of designing it. He should have reported the kickbacks instead of working to hide them.

Oxendine's co-conspirator, Dr. Gallups, has already been sentenced. Dr. Gallups pleaded guilty to an information, pre-indictment, and agreed to cooperate against Oxendine. He received a two-level downward adjustment for that cooperation. But, even under these circumstances, the Court sentenced Dr. Gallups to a mid-range sentence (33 months in a 30-37 months range after cooperation was taken into account). Oxendine agreed to plead guilty about a month before trial, after litigating (and losing) a motion to suppress his statement to law enforcement agents. Oxendine's sentence should be more severe that Gallups's sentence.

For these reasons, the government recommends a mid-range sentence of 44 months' incarceration for Oxendine (this represents a sentence between the middle of his Guideline range and the top end of that range).[2]

## 4. The sentencing factors set forth in 18 U.S.C. § 3553(a) and U.S.S.G. § 5E1.2 support a fine of $700,000.

The Sentencing Guidelines require the district court to impose a fine unless the defendant establishes that he is unable to pay a fine and is unlikely to become able to pay. U.S.S.G. § 5E1.2(a). The burden is on the defendant to prove his inability to pay. *United States v. Gonzalez*, 541 F.3d 1250, 1255 (11th Cir. 2008).

---

[2] This assumes a range of 37-46 months, which is consistent with the government's arguments in this sentencing memorandum.

Once the Court finds that a fine is appropriate, it must consider the factors set forth in § 5E1.2(d) (they overlap substantially with the § 3553(a) factors) to determine the amount of the fine. *See United States v. Hernandez*, 160 F.3d 661, 665 (11th Cir. 1998).

Here, Oxendine is able to pay a fine. His PSR shows a significant net worth. PSR ¶ 127. Given his ability to pay a fine in addition to restitution, the government recommends a fine of $700,000,[3] the amount Oxendine agreed to pay as restitution. "Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.' . . . Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal citation omitted). A fine of $699,864.89 should make the next person considering health care fraud think twice.

---

[3] This fine is within the Guidelines range for fines. Pursuant to 18 U.S.C. § 3571(d), as the PSR states, the maximum fine is twice the gross gain or twice the gross loss, whichever is greater. Here, that amount is approximately $1.4 million (twice the victims' losses). In addition, because the maximum fine exceeds $500,000, the Fine Guideline Range is increased. Pursuant to U.S.S.G. § 5E1.2(c)(2) and (4), the maximum of the Fine Guideline Range is "the maximum authorized by the statute," here $1.4 million.

## Conclusion

For the foregoing reasons, a just sentence for defendant John Oxendine would be 44 months' imprisonment and a fine of $700,000.

> Respectfully submitted,
>
> RYAN K. BUCHANAN
> *United States Attorney*
>
>
> /s/CHRISTOPHER J. HUBER
> *Assistant United States Attorney*
> Georgia Bar No. 545627
> chris.huber@usdoj.gov
>
>
> /s/DAVID A. O'NEAL
> *Assistant United States Attorney*
> Georgia Bar No. 342071
> david.oneal@usdoj.gov