**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CASE NO. 1:22-CR-00183-SCJ-RDC |
| vs. ) | |
| ) | **SENTENCING MEMORANDUM** |
| JOHN OXENDINE, ) | |
| Defendant. ) | |

### **SENTENCING MEMORANDUM**

COMES NOW, the Defendant, John Oxendine, by and through undersigned counsel, and files this memorandum in support of his sentencing position. Mr. Oxendine hereby moves this Honorable Court for a downward departure and/or a variance below his otherwise advisory guideline imprisonment range and in support of a reasonable sentence which is no greater than necessary to comply with the purposes of sentencing enumerated in 18 U.S.C. § 3553(a)(2).

### **INTRODUCTION**

Mr. Oxendine was indicted on May 17, 2022 and charged with one count of Conspiracy to Commit Health Care Fraud and one count of Conspiracy to Commit Money Laundering. On March 22, 2024, he entered a plea of guilty to Count One, Conspiracy to Commit Health Care Fraud. Sentencing in this case is set for Friday, July 12, 2024.

On June 11, 2024, counsel for Mr. Oxendine received the initial PSR.[1] Therein, United States probation calculated the defendant's total offense level at 23, with a criminal history category of I, resulting in a guideline range of 46 to 57 months. Mr. Oxendine timely filed objections to the

---

[1] The final PSR was filed on the same date as this filing, July 5, 2024.

guidelines as calculated by the initial PSR. On July 5, 2024, the Government filed its sentencing memorandum, which argued that Mr. Oxendine's total offense level should be 21. As will be detailed below, Mr. Oxendine contends that the guidelines as calculated by both U.S. Probation and the Government are factually and legally incorrect and, thus, the resulting guideline range is higher than the law demands. Mr. Oxendine respectfully requests that this Court consider his history and characteristics pursuant to 18 U.S.C. § 3553(a)(1) and the substantial support he has from his family and community as indicated in the numerous letters provided to the Court. Further, Mr. Oxendine respectfully requests that this Court consider the facts incorporated in 18 U.S.C. § 3553 as well as other judicial decision and notions of fairness in determining his appropriate sentence.

## **LEGAL ANALYSIS**

As this Court is fully aware, the United States Supreme Court made the sentencing guidelines advisory by invalidating the statutory provision that otherwise makes them mandatory (18 U.S.C. § 3553(b)) and severing the provision from the remainder of the statute. See United States vs. Booker, 543 U.S. 220 (2005).

The Court is directed to look to certain factors in determining a sentence under 18 U.S.C. § 3553(a). Some of those factors include the history and characteristics of the defendant (18 U.S.C. § 3553(a)(1)), the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense and to afford adequate deterrence to criminal conduct (18 U.S.C. § 3553 (a)(2)(A) and (B)), and the need to avoid unwarranted sentence disparities among similarly situated defendants (18 U.S.C. § 3553(a)(6)). This sentencing memorandum will specifically address the personal history and characteristics of Mr. Oxendine, and counsel will address the other factors at the time of sentencing.[2]

---

[2] Please see attached letters of support from people in Mr. Oxendine's community.

**A. <u>18 U.S.C. § 3553(a)(1): The Personal History and Characteristics of Mr. Oxendine</u>**

Mr. John Oxendine was born on April 30, 1962 in Nashville, Tennessee to his parents, Wilma and James. His family moved to Orlando, Florida, and then settled in DeKalb County, Georgia by the time Mr. Oxendine was five years old.

Mr. Oxendine describes his childhood as average, with a strong emphasis on schooling. Mr. Oxendine's father, James, had a heavy influence in his life. James grew up very poor on a pig and tobacco farm, and always emphasized the importance of education -  he called it "the great economic equalizer." When Mr. Oxendine was around 12 years old, he watched his father attend law school at nights, on top of his full-time job, to ultimately become a lawyer. This endeavor took his father about six years. At the same time, Mr. Oxendine attended DeKalb County Public Schools, ultimately graduating from Tucker High School in 1980.

Mr. Oxendine went on to attend Mercer University. His first foray into politics began the summer after his freshman year, when he landed an internship with then-Governor George Busbee. The following summer, Mr. Oxendine worked on the gubernatorial campaign for Joe Frank Harris, which he calls an eye-opening experience. Thereafter, in the summer of 1983, Mr. Oxendine worked as an intern at the Georgia State Capitol under the Harris administration. Specifically, he would answer calls from constituents and listen to their problems. Mr. Oxendine recalls that the complaints ran the gamut – sometimes people would call with concern over a family member's treatment in the criminal justice system, other times they were concerned about a local business' bad practices, and Mr. Oxendine learned to talk to people from all walks of life and find solutions to their problems. This, Mr. Oxendine recalls, is what truly got him interested in politics: the people.

By the time Mr. Oxendine went to law school, his interest in government had only grown. His dad was working as a labor attorney, and Mr. Oxendine joined his father in that practice after he

graduated. There, one of Mr. Oxendine's clients was the Georgia Chiropractic Association. Through his interactions with the doctors and chiropractors, he heard never-ending complaints about then-Insurance Commissioner Tim Ryels. They complained that he was on the side of insurance companies, not the doctors. After realizing the impact that the Office of the Insurance Commissioner had on doctors and patients across Georgia, Mr. Oxendine decided to run against Tim Ryles in 1994 and became the first ever Republican elected to that role. He went on to serve 16 years as Georgia's Insurance Commissioner.

Mr. Oxendine takes great pride in his work as Insurance Commissioner. He re-constituted the state arson unit, and spread units all around to Savannah, middle Georgia, and north Georgia. At the time, there was no fire safety education division, and he created one dedicated to educating school children about fire safety. He also went out of his way to pay close attention to people outside of the metro area and he went to counties across Georgia where the Insurance Commissioner had never previously been. As Mr. Oxendine says, "people shouldn't have to go to Atlanta to see their government, their government should come to them." He started a program where once a month in every county outside of metro Atlanta, a consumer services representative would set up at a county courthouse and help people with their insurance issues.

Mr. Oxendine's hands-on approach proved successful. He recalls a time where the Dunwoody area was badly hit by tornadoes. In the following weeks, his office was inundated with calls about peoples' claims not being addressed. So Mr. Oxendine and his staff took over three churches in Dunwoody and advertised to the community that they would be there to help. He had claim adjusters there from all the big insurance companies, and lines of people needing help. Lo and behold, they ended up getting almost every claim resolved. This is the kind of boots-on-the-ground problem solving that Mr. Oxendine came to be known for.

During his tenure as Insurance Commissioner, Mr. Oxendine lowered insurance rates, extended the hours of consumer services, created the first telemedicine program in Georgia, increased fire safety education, increased outreach to rural Georgians, and helped more people recover more money than any previous commissioner. He was widely known as a patient advocate, and was the first ever insurance commissioner to be honored by the American Medical Society as "State Elected Official of the Year" (along with the late Senator Dianne Feinstein).

When Mr. Oxendine left office in 2011, he set up his own private practice defending doctors against insurance audits. But, as he recalls, this allowed him the flexibility to dedicate more time to his family. After marrying his wife, Ivy, in 2003, the two brought children from previous marriages together, as well as their own child, Jake, who was born in 2009.

Mr. Oxendine describes his relationship with all of his kids as special, but his relationship with his youngest, Jake, is unique. He refers to him as his best friend. As Mr. Oxendine says, "[Jake] loves his mother, but I'm the guy he hangs out with." Mr. Oxendine was able to be a very hands-on parent with Jake, and is very involved in his school and extracurricular activities. Mr. Oxendine reflects fondly on his tee-ball games as a child and, more recently, when he coached Jake's flag football team.

As evidenced in the many letters of support attached hereto, Mr. Oxendine is known by those close to him as having a loving heart. He loves to cook and loves his six-year-old westie, Cotton. In more recent years, as this case has weighed heavily on him, he is most grateful for the nights he gets to spend at cooking at home with his son, Jake, and his wife, Ivy.

Mr. Oxendine is now 62 years old, with multiple grandchildren and a son just entering high school. Mr. Oxendine's conviction in this case clearly indicates that he has not lived a perfect life, and it has weighed on him heavily. However, we ask this Court to acknowledge that growth is not

always linear, and to respectfully consider the entirety of Mr. Oxendine's life when making this sentencing determination.

## B. **Defendant's Objections to the Pretrial Sentencing Report**

Mr. Oxendine objects to the following guidelines calculations outlined in the PSR:

### i. **Sixteen-Level Enhancement for Loss Calculation under U.S.S.G. § 2B1.1(b)(1).**

In paragraph 67, probation added a sixteen-level enhancement under U.S.S.G. § 2B1.1(b)(1)(I) for a loss amount of $3,015,661.62. However, this loss amount is based on the total intended loss, under U.S.S.G. § 2B1.1 Note(A)(ii), rather than the actual loss. However, where the language of § 2B1.1(b)(1) is unambiguous and the loss here was the $760,454 paid by insurance companies, that amount is the appropriate loss amount based on the plain language of § 2B1.1. The Supreme Court in Kisor v. Wilkie, 139 S. Ct. 2400 (2019) found that a Court must "exhaust all the 'traditional tools' of construction" and find that the regulation is "genuinely ambiguous" before adopting an agency's interpretation of the regulation." Although the Eleventh Circuit has not directly addressed this issue in the context of § 2B1.1, the Third Circuit in United States v. Banks, 55 F. 4th 246 (3rd Cir. 2022) looked specifically to the plain text of 2B1.1 and found that the term "loss" is not ambiguous The actual language of the guideline itself does not use the phrase "intended loss" at any point. The Third Circuit found that the expansion of "loss" to include the greater of actual or intended loss was an expansion of the plain language of the guideline and that commentary should be afforded no weight. This view has been adopted by at least one other district court in this circuit. United States v. Patel, 2023 U.S. Dist. LEXIS 148507 (S.D. Fla. 2023). The District Court's sound reasoning in Patel should be followed here:

> When a court in this Circuit is faced with a discrepancy between the Guidelines and the commentary, it must first "exhaust all the 'traditional tools' of construction" to determine if a guideline is genuinely ambiguous. Dupree, 57 F. 4th at 1275 (quoting Kisor, 139 S. Ct. at 2415). If a guideline is a unambiguous, "there is no plausible reason for deference" to the commentary, and the court must apply the guideline's unambiguous meaning. See id. (quoting Kisor, 139 S. Ct. at 2415).

Patel, 2023 U.S. Dist. Lexis 148507 at *7.

As the Court goes on to later explain, loss is loss. "Indeed, where the loss is merely "intended" it never materialized, as no "amount . . . [was] lost." Webster's Third New Int'l Dictionary, at 1338." Id. at 7-8. The text of the guideline here is clear, and the commentary's addition of "intended loss" is an expansion of the plain language of the guideline beyond its ordinary meaning. Therefore, the plain text of the guideline should control and the appropriate loss amount is $760,454.

Additionally, the amount of $760,454 is in line with what the defendant and the Government agreed to in the plea agreement. This is also the amount agreed to at sentencing for co-defendant Gallups. Accordingly, this should lead to a 14-level enhancement, rather than a 16-level enhancement.

  ii.  **Two-Level Enhancement for Role in the Offense Under U.S.S.G § 3B1.3**

Both the PSR and the Government's sentencing memorandum suggest that a two-level enhancement under U.S.S.G. § 3B1.3 should apply because Mr. Oxendine utilized a "special skill" to execute the scheme. Specifically, the Government points to the fact that Mr. Oxendine is a lawyer and the previous Insurance Commissioner of Georgia. See Doc. 88, pp. 5-8. At the same time, the Government fails to show any special skill Mr. Oxendine actually used to effectuate the scheme.

The Government suggests that Mr. Oxendine used his skills as an attorney to broker the illegal deal between NextHealth and Dr. Gallups. But assuming *arguendo* that Mr. Oxendine's mere presence and reputation as previous Insurance Commissioner aided NextHealth in coming to an agreement with Dr. Gallups, it was not due to any "skill" that Mr. Oxendine obtained as a result of "substantial education, training, or licensing ." U.S.S.G. § 3B1.3, cmt. 4.

Mr. Oxendine never used his position as an attorney to receive payments from NextHealth. NextHealth sent payments directly to Oxendine's Insurance Services business, not a law firm escrow account. Moreso, it was Dr. Gallups' skills which effectuated the entirety of the scheme – Gallups was a renowned and respected doctor, it was his practice and his employees who ordered the unnecessary tests on patients who came to his practice. Mr. Oxendine was no more than a middleman.

Additionally, Mr. Oxendine being the former Georgia Insurance Commissioner does not mean Mr. Oxendine has any specialized skills – as specialized skills are the result of "substantial education, training or licensing." Any citizen can run for office and win without having a specific background or training. Thus, Mr. Oxendine's "skills" as the former Georgia Insurance Commissioner are no different than anyone else in his position who has learned how to be a politician. In other words, Mr. Oxendine has no special skill as the former Georgia Insurance Commissioner because the position requires no special skill.

### iii. Restitution Calculation

In paragraph 72 of the PSR, U.S. Probation requests restitution in the amount of $760,175.34. However, the plea agreement calculates restitution at $699,864.89. This was also the amount agreed to for co-defendant Gallups, who is responsible, jointly and severally, for this amount along with Mr. Oxendine.

### C. **A $700,000 Fine Would be Disproportionate and Excessive.**

The Government wants this Court to impose a historically inconsistent fine on Mr. Oxendine while attempting to remain consistent on its other positions taken in Dr. Gallups' sentencing. See Doc. 88, p. 4. But the Government cannot pick and choose what it remains consistent on. While Mr. Oxendine agrees that he should have the same loss calculation as Dr. Gallups, he should also have the same fine to pay – as the two were equally liable for the same scheme. But Dr. Gallups was sentenced to pay a $25,000 fine, while the Government inexplicably wants Mr. Oxendine to pay $700,000. Nothing can justify this discrepancy.

Of the 73 cases in 2023 where the Northern District of Georgia imposed a sentence under 2B1.1, the vast majority of them included only restitution and no fine.[3] Of those 73, only *three defendants* were sentenced to pay both restitution and a fine. Thus, the mere fact that the Government is seeking a fine on top of restitution makes this case an outlier. The *extent* of the fine sought in this case makes it an utter anomaly.

Mr. Oxendine is not able to pay a $700,00 fine, and to require as much would constitute cruel and unusual punishment under the Eight Amendment to the United States Constitution. See Austin v. United States, 509 U.S. 602, 609-610 (1993) ("[t]he Excessive Fines Clause limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense".) There are no facts in this case which make Mr. Oxendine more financially responsible than Dr. Gallups. Rather, the facts show that Dr. Gallups and Mr. Oxendine were partners in the scheme and both played their separate but equal roles in executing it. One did not lose or make more money than the other. In fact, the evidence in this case reveals that while Mr. Oxendine was a previous government official, Dr.

---

[3] This information is publicly accessible through The Sentencing Commission's public datafiles, available at https://www.ussc.gov/research/datafile/commission-datafiles. It is also accessible through The Sentencing Commission's "Interactive Data Analyzer" at www.ussc.gov/research.

Gallups was truly living large: getting featured in glitzy magazine write-ups and traveling by private jet to Hollywood parties and on lavish vacations. At the time of his sentencing, Dr. Gallups was not in a financially lesser position than Mr. Oxendine is now.

Rather, the only difference between the two are the facts that one of them – Mr. Oxendine – was once a public official (long before the events underlying this case) and he is the one who did not take an early plea in this case. This does not justify such an extreme financial punishment.

The PSR stated that Mr. Oxendine is capable of paying *a fine* – not this fine.[4] Most importantly, if this Court were to impose such a fine, it would be excessive and disproportionate to both the offense itself and the sentence given to Mr. Oxendine's co-defendant.

## CONCLUSION

Based on the above, Mr. Oxendine respectfully requests that this Court issue a downward departure from the advisory guideline range in this case.

Respectfully submitted,

/s/Drew Findling
Drew Findling
Georgia Bar No. 260425

/s/Marissa Goldberg
Marissa Goldberg
Georgia Bar No. 672798

The Findling Law Firm
3575 Piedmont Road NE
Tower 15, Suite 1010
Atlanta, Georgia 30305
404.460.4500

---

[4] It should be noted that Mr. Oxendine still has a minor child that he is financially responsible for.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | CASE NO. 1:22-CR-00183-SCJ-RDC |
| vs.  ) | |
| ) | **SENTENCING MEMORANDUM** |
| JOHN OXENDINE, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**CERTIFICATE OF SERVICE**

This is to certify that I have this day served counsel for the opposing party in the foregoing matter with a copy of the within and foregoing Motion:

SENTENCING MEMORANDUM

By electronic service:

  **Christopher Huber**
  **David O'Neal**
  **Samir Kaushal**
  U.S. Attorney's Office

  **Deneen McWilliams**
  U.S. Probation Officer

This 5th day of July, 2024

                Respectfully submitted,

                /s/Marissa Goldberg
                Marissa Goldberg
                Georgia Bar No. 672798